Mercelis v. Grahame.

# EDWIN J. MERCELIS ET AL.

*v.*

# LAURENCE H. GRAHAME ET AL.

San Juan, Equity, No. 602.

1. Swamp lands in Porto Rico, of such extent that they are not situated within the unquestioned boundaries of land held in private ownership, will be presumed to be public property, such as was placed under the control of the government of Porto Rico under § 13 of the Foraker law (31 Stat. at L. 80, chap. 191).

2. El Caño or Laguna de Tiburones, in Porto Rico, is a well-known tract of "cortadera" or swamp land, 10 or 12 miles long, reaching from near Arecibo to Barceloneta, along the north shore of the island, and varies in width from a few hundred yards to more than a mile and a half.

3. Lands held in private ownership to the south of the caño, which have, as the boundary call for the north line thereof, El Caño de Tiburones, end at the edge of the caño or swamp, and do not extend into the same to any imaginary or other center line thereof, and there is in fact no channel of open water running through said caño, save at the extreme ends.

4. It would appear that there was practically no land held in fee simple or private ownership, certainly not by poor farmers or vassals of the King of Spain, in Porto Rico previous to the date of the real cédula of 1778, of Carlos III.

5. Where the government of the island of Porto Rico makes a concession of what it contends is public land, and places its concessionee in possession thereof, ejectment and deshaucio proceedings of persons claiming to be injured private owners of some of the land taken by the government for such purpose are wholly inadequate remedies, and such private owners can maintain a bill to quiet their titles as against the claims of the government's lessees. Hernandez v. J. Ochoa y Hermano, 4 Porto Rico Fed. Rep. 400 followed.

Opinion filed April 25, 1910.

*Mr. Joseph Anderson, Jr.,* solicitor for the complainants.

*Messrs. J. Henri Brown, W. N. Landers,* and *H. M. Hutchinson,* solicitors for the respondents.

RODEY, Judge, delivered the following opinion:

This is another of what have come to be known as the Caño de Tiburones cases. It is said that several similar cases have been, or are, pending in the insular courts. The first of them with which we had to do in this court was that of Rubert y Catala v. Grahame, 4 Porto Rico Fed. Rep. 538, where a statement of the supposed facts surrounding the situation can be found. To repeat them in about the same form, they are about as follows:

From time immemorial there has existed along the north shore of the island of Porto Rico, parallel to the Atlantic ocean, and only separated from it by a spit of land from a few hundred years to about a mile wide, a slough or swamp known in early days as "El Caño de Tiburones," and later as "El Caño or Laguna de Tiburones." The slough or swamp is about 12 miles long, reaching from near Barceloneta, on the east, to Arecibo, on the west. It was pretty well established by the evidence that there is within it a channel or channels of open water for a short distance on the east end, and for a slightly longer distance on the west end; but the evidence was in great conflict as to whether any such open water existed through the remaining 7 or 8 miles of the middle portion or body of it. In width this caño or swamp varies from several hundred yards to a mile and a half or more. It is almost entirely covered by what the

natives call "cortadera," which is a sort of swamp grass or flag, 6 or 8 feet high, the sides or edges of which·plant, spear, or grass have minute cutting teeth (hence the name "cortadera"), as well as on the back or spine. There are other sorts of swamp vegetation there also that will be referred to hereafter. The south shore of this caño or swamp is the only one with which we are concerned in this suit, and the evidence shows that its limits are quite indefinite in some places and well defined in others; and that its boundary meanders much, and that at places, points of the swamp vegetation extend some little distance from the main body south into the high and dry ground. It was also in evidence that there are small, partially bare patches here and there in the swamp, and some small patches covered with shrubbery and bushes not of the swamp variety, the ground being slightly higher in such small spots, but it appears that these places occur almost entirely near the shores of the main swamp, and close to the actual dry land.

It was fully established in evidence that for several years past, and probably from time immemorial, this Caño de Tiburones and more or less of the swamp lands surrounding it have been considered as public land, which it is said was owned by the government in Spanish times, and which of course passed to the United States under the treaty of Paris, and was afterwards, under § 13 of the Foraker law (31 Stat. at L. 80, chap. 191), turned over to the island, to be administered by the local government for the benefit of the people of Porto Rico. The local legislature was given full power to legislate with regard to all such public property.

In December, 1907, the local legislature leased or gave a concession or franchise for all of the land embraced in this Caño

Mercelis v. Grahame.

or Laguna de Tiburones, and probably other lands in that vicinity, to the respondent Wenceslao Borda, Jr., and his assigns. The concession was first given, as it is said, for a period of some fifteen years; but a year later, on the 19th of February, 1908, this concession, lease, or franchise, whatever it is, was extended for an additional twenty-five years, or a forty-year period in all. During this period of time the concessionee was given the right, and is probably obliged under certain restrictions and conditions in the contract contained, to occupy and drain the land, and is privileged to put it to such profitable agricultural uses as may be deemed expedient; such as the planting of sugar cane and other crops. It was contemplated, of course, that this would involve large expenditures in the way of draining, dredging, and clearing the swamp, and in cultivating the whole or such portions as could be reclaimed. It developed that as soon as the matter of granting a concession to anybody for reclaiming these lands began to be agitated, the adjoining owners began to see to it that their boundary lines were properly marked and protected, and the immediate result, as it is said, was that quite a few conflicts regarding the same arose. The government records showed that this caño should contain between 6,500 and 7,000 acres, but only 4,200 acres were found to deliver to respondent Borda. This suit was originally brought against Laurence H. Grahame and others, the former being the then commissioner of interior of the island, and under whose supervision the demarking of the caño or swamp and the putting of Borda in possession were carried on. At the trial the name of John A. Wilson, the new commissioner of the interior, was substituted for that of Mr. Grahame.

We are concerned with but two pieces of abutting property

Mercelis v. Grahame.

in this suit. A large blue print or plat that was made under the supervision of the commissioner of the interior of the island, that demarks the supposed boundaries of the Caño or Laguna, and sets forth the supposed boundaries of the adjoining owners of land, was introduced as exhibit Q by complainants. The easterly piece of land of the two in dispute here is No. 72 on this plat, and the westerly one is No. 74. The first is owned by complainants Mercelis and Greene, and the second by complainant Juan Ramon Lorenzo Domenech, the latter having purchased it from the other complainant, Greene. It is not certain how much of the northern portion of parcel No. 72 complainants contend that respondents are trying to take away from them, but as to the westerly one, No. 74, it was fully in evidence that respondents were trying to dispossess Domenech from practically his entire tract of 146 cuerdas.

A trial of the issues was had in open session by the court itself without the intervention of an examiner or master, which occupied five or six days, beginning February 28, 1910. While the suit is against John A. Wilson as an individual, naturally, the island being interested in delivering the land it claims to own, to the respondent Borda, under its concession to him, the attorney general's office represented him in the suit, and within the month following the trial fifty-page carefully prepared briefs and arguments were filed by both sides, setting forth their respective legal contentions. Whilst it involved considerable labor to examine the record and these briefs, still it was interesting, owing to the range counsel took in their views of the situation. However, we have come to see the law of the case in a much simpler light than at first.

The bill as originally filed set out that complainants had

Mercelis v. Grahame.

crops planted upon portions of the land respondents were trying
to deprive them of, and that upon each of the tracts in question
there was a spring of water necessary for the watering of their
stock, and that complainants conducted large dairy farms or
ranches, and that it was not possible to get water from any
other source, as none was available in that vicinity, and because
respondents were proceeding to erect a fence that would shut
them out from some of their crops, that the injury would be
irreparable.   It was further alleged that respondents were there
arbitrarily, under the alleged authority of the government of
Porto Rico, and were accompanied by officers, policemen, etc.,
and that they had forcibly ejected complainants from the lat-
ter's own property, and threatened to continue to keep them
excluded, and did in fact arrest, and cause the arrest of, com-
plainants for interfering with them regarding the possession
of what complainants contend is their own property.   They
further alleged that the situation was such as that nothing could
preserve the *status quo* as well as a court of equity by a writ of
injunction until the island should be either forced to become
plaintiff or complainant in a suit to quiet its own title, or these
complainants be heard on the merits in this suit.   Respondents
have not conceded that this court of equity has jurisdiction, but
strenuously contended, and so still contend, that there is a com-
plete and adequate remedy at law.   After giving the matter the
fullest consideration, and because of the surrounding facts, all
of which we have not set out here, and because of conditions
existing in Porto Rico, which are more fully set forth in our
opinion in Hernandez v. J. Ochoa y Hermano, 4 Porto Rico
Fed. Rep. 400 et seq., and in Rubert y Catala v. Grahame, 4
Porto Rico Fed. Rep. 538, supra, we concluded the suit was

properly here, and we concluded that the remedy at law was wholly inadequate, because it would settle nothing and would involve such an examination of the Spanish law of waters and the laws regarding the public domain and the mode in which citizens acquired title to land from the Spanish Crown, as that no jury could intelligently pass upon the issues that would of necessity arise. When the proofs were all in, counsel for complainants moved for leave to amend the prayer of their bill so as to make it conform to the proofs, and in effect constitute it a bill to quiet title. We granted the motion *pro forma,* provided, after the examination of the whole case, we should be of opinion that it was proper to do so. To this, of course, respondents objected; but now, after having examined the whole case, we are still constrained, particularly under § 392 of the Civil Code of 1902, to grant the motion and to consider the bill in that light, and will therefore proceed to pass upon the whole case upon the merits.

The two tracts that are in dispute here are situated 2 or 3 kilometers west of Barceloneta, opposite the little station of Citrus, on the American Railroad. They are parcels of land carved out of a collection of fruit farms known as the Cummings plantations, which were started some few years ago on the south shore of the caño at that place. They are not contiguous, because a tract of land known as parcel No. 73 on the plat referred to, belonging to the Cameron heirs, comes in between them. So far as the record shows, there appears to be no dispute as to this Cameron tract, that estate not claiming to own beyond the line demarked by the government for Borda as the south boundary of the Caño or Laguna de Tiburones. The width of parcel No. 72 from east to west is probably four or five hundred yards, and that of parcel No. 74 somewhat more.

Mercelis v. Grahame.

A large amount of oral evidence was submitted, the same being by engineers and others, intended to show the character of this Caño or Laguna de Tiburones. It is utterly in conflict between the respective sides on some of the main questions. For complainants it was strenuously contended that there is, or was, until it was perhaps somewhat obscured by cloud bursts or cyclones, extending along or near the center of the whole of this caño or laguna, an open space or channel, which is the north boundary of all of the tracts of land to the south that have the caño as the boundary call of their deeds on that side. On the other hand, it was contended, and the evidence tended to show, that this caño is a well-defined swamp, with this cortadera and other swamp plants and grasses growing in it to the height of 6 or 8 feet, and that it is, and always has been, practically impossible for man (on foot) or livestock to cross it, and that there is not, and never was, any center line or open water space in or about it, but that it is a flat, continuous jungle or swamp that looks, a short distance away, like a vast field of tall and scrubby grain. In such utter conflict was this evidence as that counsel for both sides requested and stipulated in open court that the court itself should make a trip to the place in question and see its exact condition, the cost of the trip to be charged with the other costs of the case. Therefore, on Friday, April 8, 1910, in company with a deputy marshal, we proceeded to the station of Citrus, and there spent four or five hours in examining the land in question and the swamp, as well as all the surrounding country, riding over the latter, where it was possible, on horseback. We were provided with field glasses, and in several places climbed trees growing at the edge of the morass, so as to get a better view of the swamp or caño, because

Mercelis v. Grahame.

it in fact proved to be utterly impossible for man or beast to enter it on foot. We found that the caño would be a lake if it had nothing growing in it, but that it in fact is a flat, continuous swamp, completely covered with water of varying depths, in which is growing this cortadera, and with "cat-tails" and flags, and with several other kinds of swamp plants and grasses, such as wire grass, telescope grass, and other aquatic growths, and that the ground under this swamp growth and water is mostly covered with a cress or mossy growth as soft as a sponge, and that the cortadera and flags and cat tails are as continuous as the growing grain on a wheat field, and 6 to 8 feet high, or even more, and are apparently continuous for a mile and a half away to the north to the spit of high land intervening between the caño and the ocean. Along the south shore there is an occasional small spot of higher or purely dry land, and along the actual shore there is a more or less continuous line of trees, and the trees or these fruit farms (referred to in the evidence) come in places almost up to the actual edge of the swamp. From the amount of ditching done close to the edge of the swamp, it is manifest that efforts have recently been made to plant malojilla and other grasses and crops on a few acres of it within the last year or two, but at the time we visited it, all of this had entirely disappeared, and the ground had reverted to the swampy condition, the cortadera and other growths and the moss recovering itself as fast as time would permit. We saw the place where respondents had attempted to put their fence, and in some places it certainly does encroach upon the dry ground which we think properly belongs to complainants, even though they have done considerable ditching to make that portion of the land available. The points of the swamp that run south into the hard or dry land sometimes simply fade into the harder ground, and it is quite difficult to

Mercelis v. Grahame.

demark the actual point of division; but it was manifest that the two springs in question were within and upon what complainants could in all fairness claim to be their ground. However, from the evidence submitted, both oral and written, which of course includes all the many deeds and other documents introduced, and from our own examination of the actual ground, we are satisfied that there is not, and never was, any channel or open water in the center of this caño that is, or could be, or ever was, used as a northern boundary by any of the landowners on the south. It is manifest also that at certain seasons of the year this southern edge of the caño or swamp is dryer than at other times, because there were several ditches running north into the swamp land, although now completely covered with cortadera; but it was manifest that these ditches could not have been dug except by men working to their knees in water, unless the water was lower than when we saw it. In several places at the present edges of the swamp there are east and west ditches, and these have standing water in them so near the surface as that, to the north of those ditches, the land is practically impassable, even where it has been cleared for a few yards, and absolutely so after an advance of a few yards to the north is made.

Complainants start their titles back many years, probably half a century, from two original tracts of 480 and 420 cuerdas respectively, and from which they claim the two parcels in controversy, one of 156 cuerdas and the other of 145 cuerdas, are carved or segregated, and they claim that the north line of these tracts respectively runs many hundreds of yards out in this swamp or cortadera to this alleged open channel or center line, one of them, that north of parcel No. 74, having been surveyed a year or so ago, and, as it is said, stakes put out at

the edge of this alleged open channel at the northeast and north-
west corners of the tract.    Personally we found it utterly im-
possible to go there to see if those stakes were in fact there, or
to see if any such channel existed; but from our examination
with the field glasses from the trees along the edge which we
climbed for that purpose, we do not believe there is any such
channel there, or that the same has ever been used by anybody
as a boundary line for land on the south, and that the testimony
of the respondents' witnesses is true as to this.    The waters of
this swamp have no doubt recently receded somewhat, probably
since respondent Borda began to dredge, for he has a long ditch
or two extending out of sight to the east and west, something
north of midway of the caño, as could be seen with the field
glasses from the trees in question, and from the surrounding
hills, and evidence to that effect was also introduced at the trial.

A fact worth mentioning also is that no deed introduced in evi-
dence by complainants describes the north boundary as anything
save the caño de Tiburones until a year after the date of the
original lease or concession to Borda by the commissioner of the
interior of the island and the legislature, and several months
after the extension thereof, and after the actual beginning of
dredging operations, when the deeds under which these com-
plainants claim change the north boundary without apparent
reason, and describe the land as part swampy and part pasture
lands.    This occurs for the first time in the deed of Cummings
Brothers to one Knight, who, in a few days, conveys to com-
plainants Mercelis and Greene under the same description.    But
in all the older deeds for the larger tracts from which the dis-
puted parcels were carved, the land is described as pasture
land.    The complainant Greene transferred the 156 cuerdas of

land carved out of parcel No. 74 only quite recently to complainant Domenech, and 146 cuerdas of it are attempted to be taken by the government as part of this caño.

We have many times since occupying this bench, when considering land titles, endeavored without result to ascertain the system by which land in Porto Rico left the sovereign and became vested in the subjects of the King of Spain. We were quite familiar with the system in vogue regarding the many millions of acres involved in the land grants emanating from the Spanish and Mexican governments in New Mexico previous to American occupation thereof, and were accustomed to have the actual Spanish grants (mercedes), expedientes, and archives introduced in evidence as the source of all such titles, but have seen nothing of that kind here, yet it is said such expedientes exist. Thus, we were not certain how the title to land in Porto Rico now held in private ownership left the sovereign. However, in this case respondents introduced in evidence a copy of what is known as the real cédula de Carlos III., which is a land cédula or royal edict of King Carlos III., made January 14th in the year 1778, or, at least, what is said to be a copy of it, which with a translation thereof is inserted at the end of this opinion. It seems that in that year (two years after American independence), the King made up his mind to vest the holders of land in Porto Rico with a sort of conditional title thereto; and, as can be seen, instructed his governor general to make an investigation in that record, and grant such titles to the people; and, at the same time, mentioned a grant of 4 leagues of land he had previously made to the Duque de Mahon, and required that it be located and segregated. This latter merced is the only positive royal grant of land made di-

Mercelis v. Grahame.

rectly by the King himself that has so far been called to our attention since coming to the island. We do not doubt, though, that there are probably many others in the insular archives. See a reference to the one referred to, in an opinion of the supreme court of Porto Rico in the case of the Enmanuel v. El Pueblo de Puerto Rico, 2 Porto Rico, 103, and our own reference thereto in a case bearing the same title, ante, 89.

It will be seen from the terms of this real cédula that in a general sense the King of Spain, at that relatively recent date, did not concede that at least the ordinary farmer or vassal in Porto Rico had any title to the land he was occupying, but that the fee was still in the Crown. It will also be seen that in and by the cédula it was intended to foster agriculture and cattle raising in Porto Rico, and only those were to be given title to their lands, or permitted to hold what they then were occupying, who should show themselves industrious, and who in fact made proper use of such lands. It will also be seen that there were certain waste lands apart from the agricultural and pasture lands and drinking places, that still remained to the King. It will also be seen that the King had in mind at the time the town of Arecibo, near which the lands we are now discussing are located, because by that very cédula he created it and other places into "villas."

The government of the island, in support of its lessee's claim to the possession of the land in controversy here, did not produce anything such as would ordinarily be expected in the way of proofs, such as plats, maps, lists of public land, deeds, expedientes, or other muniments of title, showing that the caño or laguna in question was in fact public land. In fact, no real satisfactory evidence or lists of the public lands of the island,

Mercelis v. Grahame.

as the same have been claimed by the government from time immemorial, was introduced, and counsel confessed there is nothing of that kind in the local archives; the only thing they could find being an old inventory or index which merely mentions the existence of this Caño or Laguna de Tiburones as public land. However, there was a good deal of evidence on both sides of the case as to this matter. On the one side, many witnesses testified that for many years, as far back as they could remember,—and some of them were well past middle life,— they had known that the public owned land in that vicinity, or owned the Caño de Tiburones. While, on the other hand, complainants introduced some witnesses who testified they had no knowledge and never heard of the government having any land there. However, the weight of the evidence on this subject is entirely with respondents, that the government has always been considered as owning the lands comprising the caño.

After an impartial consideration of the whole case, we are constrained to believe and to hold that this Caño de Tiburones in all its extent has been, from time immemorial, save where specifically granted away by the King, or under his laws or order, and still is, public property, and that none of the deeds to land in that vicinity that use the Caño de Tiburones as a boundary include any of the swamp land in question, but that the boundary of all such private land ends at the edge thereof.

As to tract No. 74 which complainant Greene recently conveyed to complainant Domenech, we think the survey of the 156 acres in question out into the swamp was a pure act of aggression, and that none of the deeds upon which the same is claimed to be based call for any of that land as being included within the description. We are of opinion that, as time passed, this

cortadera or these swamp growths spread and increased rather than that they died out or diminished or receded, and as the caño has no doubt, from time immemorial, been a drinking place for the live stock of the owners of abutting lands, all doubts as to ownership along the edges of the caño should be resolved in favor of the adjoining owners. This is the reason we think the springs, which are the main cause of the quarrel, should be held to be the property of complainants; and further, that wherever the line attempted to be located by respondent Borda, or the government for him, encroaches upon the dry ground, or upon what certainly is complainants' land, the same should be removed and placed along the edge of the well-defined, actual swamp, and so well within the same as to leave a couple of yards thereof to complainants fronting on their land.

Therefore an independent surveyor will at once be named by the court, to proceed to the tracts of land in question, Nos. 72 and 74, as described in exhibit Q for complainants, and he shall demark and stake out the boundary line between the parties as to each of the tracts as here intended, leaving the springs in each instance, together with not less than 10 feet of ground north of the edges thereof at such places to the complainants respectively, and shall meander the boundary from such points respectively to conform to the actual swamp across the front of each tract, and within the actual swamp as intended by this opinion.

It is our view that both parties are to blame for this litigation, —the complainants for claiming more land than they are in fact entitled to, and respondents for doing exactly the same thing; hence, each party will be required to pay their own costs respectively, and those of the surveyor to be so sent to the

ground will be divided equally between them; and after the survey is brought in and approved, a decree will be prepared quieting complainants' titles respectively to the extent only in accordance with the views herein expressed, and in accordance with the survey thus to be made of the said north line in each case, as to the portion of land herein held to belong to complainants respectively, and dissolving the injunction against respondents as to the balance of the land held by this opinion to be included in the Caño de Tiburones. The cause will be retained for all proper purposes until such final decree is approved, signed, and entered.

---

SECRETARIA GENERAL DEL SUPERIOR GOBIERNO, CAPITANIA GENERAL Y SUPERINTENDENCIA DELEGADA DE REAL HACIENDA DE PUERTO RICO.

REAL CÉDULA DE 14 DE ENERO DE 1778 PARA EL REPARTIMIENTO DE TERRENOS.

El Rey:

Con presencia de lo representado por mi gobernador y capitan general de la isla de San Juan de Puerto Rico y del cavildo secular y vecinos hacendado de ella, en que manifiestan estar prontos aquellos naturales á proporcionar un arbitrio con que costear el vestuario y armamento del las milicias disciplinadas de aquella isla, para lo cual propusieron como mas conveniente el impuesto de real y cuartillo por cada cuerda de tierra de las de estancias, y tres cuartillos de real en cada cuerda de hato, si se les concedia la propiedad de tierras que hasta ahora han tenido en uso los vecinos de allí. Deseoso yo siempre de facilitar á mis fieles vasallos todos los auxilios posibles, he venido en conceder á los vecinos de la expresada isla, la propiedad de tierras que solicitan, con objeto de escitar á aquellos naturales la aplicacón al mayor cultivo de ellos, con tal que lo verifiquen con la contribución anual de un real y cuartillo por cada cuerda de estancia, y la de tres cuartillos de real por la de cuerdas de hatos, con el fin espresado

Mercelis v. Grahame.

de costear el citado armamento y vestuario de las milicias disciplinadas de dicha isla, y para facilitar el arreglo de estos dos ramos de cria de ganados y agricultura que son los principales de la isla, con una justa proporción á los terrenos propios y adecuados á cada uno, para que el mayor formento del uno no debilite al otro, mando al gobernador de la isla que nombrándose inteligentes por los hacendados de uno y otro ramo, con asistencia de D. Pedro Vicente de la Torre, la del procurador sindico primero, y la de otro regidor de la ciudad, con dos personas de probidad que designara el gobernador para entender y autorizar el acto, se proceda al reconocimiento y vista ocular de todo el terreno que comprende la isla, señalando los terrenos mas aprepositos para labor, y la clase ó yermo de frutos que en cada uno de ellos se halla de sembrar segun su respectiva utilidad; segundo, tambien con señalamiento formal los terrenos adecuados para los hatos y criaderos de todas clases de ganados, con concepto á los mas convenientes y útiles á la isla y á los que necesitan de mayor fomento atendido la decadencia que entre otras esperimenta el ganado de lana, fijando un ito y mojones para que en todo tiempo conste de la repartición de terrenos y su destino y si consta contiendas. Para lo cual autorizo y doy facultad á mi gobernador capitan general de la isla á efecto de que, en vista de estas diligencias, haga el formal señalamiento, repartición, y aplicación en propiedad á cada vecino de las tierras que hasta ahora hayan tenido en uno para sus criaderos y cementeras segun les cupiere por efectos de la citada visto ocular y señalamiento que se prescriba, espidiendoles los despachos correspondientes en mi real nombre, pero con la calidad de que, si alguno ó algunos no los trabajasen en al todo, ó en la mayor parte, ó descuidaren en el fomento de los destinos á que se hayan aplicado en virtud del reconocimiento y vista territorial que ordeno, tanto de terrenos para la agricultura como para criadero ó hato, conforme á la constitución y necesidad de la isla, puede y debe el gobernador interpelador que sean primeramente para la aplicación é industria en estos ramos, separarlos y absolutamente remedirles y quitarles la propiedad, posesión, y uso de las mismas tierras y terrenos que así se abandonasen ó no cuidaren de que prosperen, y aplicarlas y concederlas con el mismo titulo de propiedad á otros vecinos y naturales en quien creyere la debida aplicación y proporción, procediendo para ello la debida calificación del hecho audiencia del interesado, y sentencia declaratoria del juez competente, quedando abierto el recurso de apelación conforme á derecho á la real audiencia de Santo Domingo. Y debiendo considerarse por resultar de la operación que se encarga varias tierras y terrenos valdios que hasta ahora no hayan tenido dueño temporal á quien en uso correspondan, propongo asimismo á mi gobernador capitan general de la isla que en estas tierras y terrenos debe aplicar el Duque de Crillon las cuatro leguas de tierras de que le hace merced, bajo

Mercelis v. Grahame.

los terminos que contiene mi gracia, y lo que quedare sobrante, aplicados los terrenos pastos y abrevaderos que con nombre de egidos disponen las leyes de Indias, tengan las ciudades, villas, y poblaciones de America, lo distribuya con el privilegio de propiedad entre los habitantes y naturales de allí, que tengan mas proporción, prefiriendo á los menos acomodados, que requieran este ausilio para mejorar su suerte y reducida constitución á fin de evitar que toda la felicidad y prosperidad que mis reales intenciones desean comunicar á esa isla, se refunda y aunque en un corto numero de pudientes, dejando á el mayor de aquellos vasallos en la clase de unos meros jornaleros y merecieron de estos otros; procediendo con la misma consideración en el repartimiento de las tierras y terrenos que declare vacante por la flojedad y desidia de los que los tenian segun la forma que queda espuesta. Y para que estas importantes diligencias actuadas segun se espera con la justificación, arreglo, y conocimiento que demandan, sirvan de regla en lo sucesivo que esplique tanto la demarcación y destino de las tierras y sus aplicaciónes como de gobierno á los que quedaren por dueños de ellas para el exacto desempeño dc su respectiva obligación por menor, y á los gobernadores que por tiempo fueren de luz y guia para hacerlas observar. Mando á mi gobernador y capitan general de la isla que, concluida la operación, adjudicación y señalamiento de tierras en la forma prevenida forme un código de ordenanzas, poniendo por cabeza un catalogo ó lista de todos los repartimientos que se hicieren, medida de cada uno, sujetos á quien se adjudique, y designación de la calidad y frutos á que se aplique cada parte de tierra, el todo estractado de los autos de deslinde general á que deben formarse, y que cstos como las espresadas ordenanzas se me remitan por medio de mi secretario de estado y del despacho de las Indias para exámen y aprobación sin que entretanto se suspenda el uso de la adjudicación y goce de los sujetos á quienes se haya repartido. Para formar el ramo del giro y comercio de aquella isla con esto mis Reynos de España, vengo en permitir las siembras de caña dulce, pimiento, malagueta, algodon, añil, achote, cafe, y gengibre, segun y como se me propuso por mi gobernador á representación de la ciudad y hacendados con tal que las cementeras plantios se atemperen á las tierras que se graduaren propias á la producción de estos frutos segun el señalamiento que se ejecute. Y siendo informado que para la siembra de caña dulce y establecimiento de ingenios de azucar necesitan sacar de las colonias inmediatas extrangeros algunos operarios inteligentes en todas sus maniobras y beneficios y los aperos utensilios correspondientes, encargo estrechamente á mi gobernador capitan general de la isla que solo pueda conceder las licencias necesarias para trasportar el muy preciso número de operarios, con tal que sean Catolicos Romanos, que me juren el homenage de fidelidad y vasallaje, y prohibición de que puedan tratar ni

Mercelis v. Grahame.

comerciar directa ni indirectamente, celando igualmente que solo se tras-
porte el mas preciso número de utensilios, y mirando con el mayor celo y
precaución que á su sombra no se actue el trato ilicito.　A fin de que logre
el mayor fomento la agricultura de la espresada isla y de su comercio con
este Reyno he tenido por conveniente conceder á aquellos naturales la
siembra y cultivo del tabaco y cacao, para que ambos frutos puedan venir
á España, y estraerlos para los Reynos estranjeros en la forma que le
está concedido á la Real Compañia de Caracas por lo respectivo al tabaco, y
para que prospere el giro del comercio de azucar con este reyno, y se
estinga el perjudicial abono de no beneficiar la purga para los aguardientes,
he tenido por conveniente prohibir la fábrica de ellos á los que no lo
verifiquen de la purga de azucar, permitiéndose los puestos publicos para
la venta solo á los que hagan constar la reducción de la purga en este licor,
bajo la contribución de seis pesos cada barril.　Siendo uno de los princi-
pales puntos de mis reales intenciones el aumento de población de mis
dominios y la recta administración de justicia en ellos, he venido en con-
ceder el nombramiento de villas con cabildo, justicia, y regimiento en los
propios terminos que lo está la de San German, á los tres queblos nom-
brados la Aguada, Arecibo, y Coamo, Utuado y Tuna, á la segunda, la
Aguadilla, la Moca, el Rincon, y el Pepino; y para la tercera, Ponce,
Guayama, y Cayay de Mucca, ciñendose en un todo á las leyes que tratan
de la materia.　Para evitar los fraudes y abusos que se practican contra
mis reales intereses en la población de la Aguadilla con la denominación de
San Carlos y Maria de la Victoria he resuelto establecer allí un teniente
de oficial real, con algun otro dependiente y escribano, que haga todas las
funciones del ministerio de oficiales reales para que exijan y celen los
derechos que me pertenecen; y para que se tenga entendido que así es mi
voluntad, someto esta, mi real cédula, á mi gobernador capitan general
de la expresada isla de San Juan de Puerto Rico, á efecto de que la cumpla
y haga cumplir en todas sus partes, tomandose razon de ella en la con-
taduria general de mi consejo de Indias.　Dada en el Pardo, á 14 de Enero
de 1778.　Yo, el Rey. José de Gulvea, V. M. concede á los vecinos de la
isla de S. Juan de Puerto Rico la propiedad de tierras de la expresada isla
que hasta ahora solo han tenido en uso, y la facultad de poder beneficiar la
siembra de cacao y tabaco, como igualmente crear en villas los tres pueblos
de Aguada, Arecibo, y Coamo, en la propia conformidad que lo está la villa
de S. German.　Tómese razon en la contaduria general de las Indias.
Madrid, 20 de Enero de 1778.　D. Francisco Mudecudo.　Hay una rubrica.
Es copia.　Hay una firma ilegible.

Mercelis v. Grahame.

(Exhibit "C" for Defendant, No. 602.)

DEPARTMENT OF THE GENERAL SECRETARY OF THE SUPERIOR GOVERNMENT. OFFICE OF THE CAPTAIN GENERAL AND DELEGATED SUPERINTENDENT OF THE ROYAL TREASURY OF PORTO RICO.

ROYAL DECREE OF JANUARY 14TH, 1778, FOR THE DISTRIBUTION OF LANDS.

The King:

In view of the representations made by my governor and captain general of the island of Porto Rico, and of the secular municipal council and resident planters thereof, in which they state that the said citizens are about to levy a license tax wherewith to pay for the uniforming and arming of the disciplined militia of that island, for which purpose they propose as most advisable the imposition of a tax of a "real" and a "cuartillo" upon each cuerda of land comprising the hatos," if a grant were made to them of the ownership of the lands which the residents thereof have, up to the present time, had in use. Always being desirious of affording my faithful vassals all the assistance possible, I hereby grant to the residents of the said island the ownership of the lands for which they ask, with the object in view of encouraging the said residents to apply themselves to the greatest possible cultivation of the said lands, provided they do so by the payment of an annual tax of one "real" and a "cuartillo" upon each cuerda of estancia lands and a tax of three "cuartillos" of a "real" upon each cuerda of hato lands, for the said purpose of paying the expenses of uniforming and arming the disciplined militia of the said island, and in order to facilitate the administration of these two industries, that is to say, cattle raising and agriculture, which are the principal industries of the island, with a just proportion of the lands adapted to each, and in order that the greater development of one may not decrease the other, I order that the governor of the island, after the appointment of intelligent persons, by the landowners engaged in the two industries, agriculture and stock raising, with the assistance of Don Pedro Vicente de la Torre, that of the solicitor syndic first, and that of another councilman of the city, with two persons of probity, to be designated by the governor, to attend and authorize the transaction, proceed to make an examination and ocular inspection of all the lands within the island, designating the lands which are best suited for cultivation, and the kind of products, if any, which shall be grown upon each, according to the usefulness of each; second, also formally designating the lands which are suitable for grazing and the raising of all kinds of live stock, having in mind the most beneficial and

Mercelis v. Grahame.

useful to the island, and the kinds that require the greatest development, in view of the decrease experienced, among others, in wool-producing stock, establishing landmarks in order that, at all times, the distribution of the lands, and to what object they shall be devoted, and whether there is any dispute, may clearly appear. For all of which I authorize and empower my governor captain general of the island, in order that, in view of these proceedings, he may make a formal designation, distribution, and application in fee to each resident of the lands which, up to this time, they may have had in use for stock raising and cultivating, as they might appear from the said ocular inspection and designation to be best fitted, issuing to them proper instruments in my royal name, but with the qualification that if anyone or any of them should not work the whole of the same, or the greater part thereof, or should neglect the promotion of the objects to which the same may have been devoted by virtue of the examination and inspection of the land which I order to be made, either of agricultural lands or lands for stock raising or herding, according to the constitution and the necessities of the island, the governor, upon whom this duty is imposed, may and must see that they are primarily devoted to the said use and industry to separate and remeasure them and absolutely take away from them the ownership, possession, and use of said lands which may have been so abandoned or not cared for, and apply and grant the same under the same title of ownership to other residents and natives whom he may believe to be possessed of the requisite aptitude, proceeding for the purpose to the qualification of the fact and hearing the party in interest, and the rendering of a declaratory judgment by a competent judge, such party having the remedy of an appeal in accordance with the law, to the royal court of Santo Domingo. And taking into consideration that there will remain, after the provisions hereof are carried out, certain waste lands which, up to this time, have had no temporary owner to whom the use thereof belonged, I likewise propose to my governor and captain general of the island, that in the said lands the Duke of Crillon should apply the 4 leagues of land which are granted to him under the terms of my concession, and what remains over after the lands, pastures, and drinking places for cattle which the law of the Indies designates as ejidos, embraced within the cities, villages, or towns of America, have been applied, shall be distributed with the privilege of ownership among the inhabitants and natives thereof having the greatest aptitude, giving preference to the poorer persons who require this aid to better their condition and weak physical constitution, in order to prevent all the happiness and prosperity which it is my royal intention to bestow upon that island, from redounding to the benefit of a limited number of wealthy persons, leaving the majority of those vassals in the class of mere day laborers, and dependent upon the others; proceeding

Mercelis v. Grahame.

with the same consideration in the distribution of the lands which he may declare vacant by reason of the laziness or indolence of those who had them according to the manner above stated. And in order that these important proceedings carried out as is hoped, with the justification, care, and knowledge which they demand, shall serve as a rule in the future which will explain the demarcation and object to which the said lands shall be devoted, as a guide for those who shall remain as the owners thereof, and induce a strict compliance with their respective obligations, and to the governors who may be a light and guide in enforcing the same, I order my governor and captain general of the island, upon the conclusion of the transaction, adjudication, and designation of the lands in the manner provided for, to draw up a code of ordinances, heading the same with a catalogue or list of all the distributions which may be made, the measurements of each, the subjects to whom they are awarded, and the designation of the quality thereof and the fruits for the production of which each portion of land shall be devoted, all extracted and compiled from the records of the general survey or demarcation which shall be made, and that these, as well as the said ordinances, shall be forwarded to me through my secretary of state and department of the Indies, for examination and approval; but in the meantime the adjudication and enjoyment thereof by the subjects to whom the same may have been distributed shall not be suspended. In order to establish commercial and business relations between that island and these, my kingdoms of Spain, I hereby permit the planting of sugar cane, pepper, bay trees, cotton, indigo, anato, coffee, and ginger, as was proposed to me by my governor, in representation of the city and the planters, in order that the crops and plantations may become adapted to the soil which may be considered capable of the production of these fruits, according to the designation to be made. Having been informed that, for the planting of sugar cane and the establishment of mills for grinding the sugar, it is necessary to bring from the nearby foreign colonies some intelligent operators, familiar with all the works and uses and the proper implements therefor, I strictly charge my governor captain general of the island, that he may only grant the necessary licenses to transport the smallest number of operators, provided they be Roman Catholics, who will swear allegiance and loyalty to me as subjects, and they shall be forbidden to trade or engage in commerce, either directly or indirectly; and being careful to import only the most necessary number of implements, and exert every care and precaution to see that no illegal traffic is carried on under this guise. In order that the greatest agricultural development may be brought about in the said island and in commerce with this Kingdom, I have deemed it proper to grant to the natives of that island the privilege of cultivating tobacco and cacao in order that both products

V. Porto Rico—33.

Mercelis v. Grahame.

may come to Spain and therefrom be exported to foreign kingdoms in the manner permitted the Royal Company of Caracas with respect to tobacco. And in order that business and commerce in sugar with this Kingdom may prosper, and that the prejudicial practice of not utilizing the sugar molasses for the manufacture of spirituous liquors, I have deemed it wise to prohibit the manufacture thereof to those who do not make the same from sugar molasses, public vendors being allowed to sell only such as is shown to be made from sugar molasses, they paying a tax of 6 pesos per barrel thereon. One of the principal points of my royal intentions being the increase in the population of my dominions, and the upright administration of justice therein, I have decided to designate as "villas" with a council, courts of justice, and a regiment, under the same conditions as San German, the three towns known as Aguada, Arecibo, and Coamo, Utuado and Tuna, and for the second, Aguadilla, Moca, Rincon, and Pepino, and for the third, Ponce, Guayama, and Cayey de Mueca, they all being in every respect subject to the laws governing the matter. In order to avoid the frauds and abuses practised against my royal interests in the town of Aguadilla with the denomination of San Carlos and Maria de la Victoria, I have decided to establish there a lieutenant royal officer, with some other clerk and notary to discharge the functions pertaining to royal officers, to insist upon and protect my rights. And in order that it may be understood that this is my wish, I submit this royal decree to my governor, captain general of the said island of San Juan de Puerto Rico, that he may comply and compel compliance therewith in all its parts, a record thereof being made in the general exchequer of my council of the Indies. Given in Pardo on January 14, 1778. I, the King. Jose de Gulvea. His Majesty grants to the residents of the island of San Juan de Puerto Rico the ownership of the lands in the said island of which, up to this time, they have had only the use, and the power of exploiting the cultivation of cacao and tobacco, as also the creation into "villas" the three towns of Aguada, Arecibo, and Coamo, in the same manner as the "villa" of San German. The general exchequer of the Indies will enter a note hereof. Madrid, January 20, 1778. Francisco Mudecudo. There is a rubric.

Copy.

(There is an illegible signature.)